**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TRUE VALUE COMPANY, f/k/a** | ) | |
| **TRUSERV CORPORATION f/k/a** | ) | |
| **COTTER & COMPANY** | ) | |
| | ) | |
| **Plaintiff/Counterclaim** | ) | |
| **Defendant,** | ) | |
| **v.** | ) | **No. 15 CV 6557** |
| | ) | |
| **4950 SOUTH KIPLING PARKWAY, LLC** | ) | |
| **d/b/a LITTLETON TRUE VALUE** | ) | **Judge Rebecca R. Pallmeyer** |
| **HARDWARE and RONALD C. ERWIN** | ) | |
| | ) | |
| **Defendants/** | ) | |
| **Counterclaim Plaintiffs.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In 2012, Ronald Erwin owned 4950 South Kipling Parkway, LLC ("4950"), which operated a True Value hardware store in Littleton, Colorado. In spring 2012, the 4950 store ordered some $400,000 worth of inventory from True Value, purportedly on the understanding that the goods were "free." An agreement that Erwin signed in June 2012, however, on its face requires the store and Erwin (who guaranteed the store's obligations to True Value) to repay True Value for the inventory if the store did not stay in business for seven years. The store did not survive, and True Value has filed this lawsuit alleging claims of breach of contract (Count I), account stated (Count II), and breach of guaranty (Count III).[1] Defendants contend that True Value's claims fail on the merits and are defeated by various affirmative defenses. They also allege in a counterclaim that True Value owes the 4950 store a member dividend. Both sides have moved for summary judgment. For the reasons explained in court and summarized here, Defendants' motions are denied and Plaintiff's motion is granted in part and denied in part.

---

[1]     The court's jurisdiction is secure: Erwin and 4950 are citizens of Colorado; True Value is a citizen of Delaware, where it is incorporated, and Illinois where it has its principal place of business; and more than $75,000 is at stake. Venue rests on a forum selection clause in the parties' March 2012 Member Agreement.

## BACKGROUND

In 2012, Ronald Erwin, a citizen of Colorado, was the owner and sole member of 4950 South Kipling Parkway, LLC, a Colorado limited liability company. (Statement of Uncontested Facts in Supp. of Def.'s Mot. for Summ. J [46] ("Def.'s SOF") ¶¶ 1–2; Pl.'s Statement of Material Facts in Supp. of Mot. for Partial Summ. J. [42] ("Pl.'s SOF") ¶ 3.) Erwin has been in the hardware business for forty years and has operated hardware stores under several different names. (Pl.'s SOF ¶ 11.) The relationship between 4950 and True Value began in January 2012; Erwin signed a Retail Growth Agreement with True Value at that time, and though he does not recall signing a Member Agreement at that time, it is undisputed that he did sign such an agreement in March 2012. (Def.'s Rule 56(b) Resp. to Pl.'s Statement of Material Facts [56] ("Def.'s Resp. to Pl.'s SOF") ¶ 12.) The Member Agreement requires True Value members to pay all financial obligations to True Value when due. (Pl.'s SOF ¶¶ 6–7.) Erwin also signed a personal guaranty for all of 4950's obligations to True Value. (Ex. G to Pl.'s SOF [42-1] ("Guaranty").)

The Retail Growth Agreement that Erwin signed on behalf of 4950 in January 2012 (Ex. H to Pl.'s SOF [42-1] ("First RGA")) provided that 4950 would receive a 25% credit against the cost of the store's Opening Stock Order ("OSO")—that is, the initial inventory of products for a new True Value store—up to $125,000. (Pl.'s SOF ¶¶ 9, 15.) The 4950 store ordered inventory in phases (Dep. of Tarinna Hannigan, Ex. 3 to Def.'s Mot. for Summ. J. [49] ("Hannigan Dep.") 43:3–8), beginning with approximately $50,000 of goods in its initial OSO order soon after Erwin signed the First RGA. (Def.'s Statement of Additional Facts Requiring Denial of Pl.'s Mot. for Summ. J. [56] ("Def.'s Stmt. of Add'l Facts") ¶ 2.)

In February 2012, Erwin attended the True Value Spring Market (also referred to as the "Market Show"), a meeting of thousands of True Value members in Orlando, Florida. (Def.'s SOF ¶ 7; Decl. of Dayton Herbranson, Ex. Q to Pl.'s SOF [42-1] ("Herbranson Decl.") ¶ 10; Dep. of Dayton Herbranson, Ex. 2 to Def.'s Mot. for Summ. J. [49] ("Herbranson Dep.") 61:20–62:6.)

2

Erwin contends that at that meeting, True Value representatives described a new retail program in which members could receive "free goods" of up to $450,000 in value from True Value. (Def.'s SOF ¶ 8; Pl.'s SOF ¶ 17.)   True Value acknowledges that the new program being developed in 2012 provided for a $450,000 credit for OSO goods, but contends that the credit was available only under certain terms and conditions.   (Pl.'s Resp. to Statement of Uncontested Facts in Supp. of Def.'s Mot. for Summ. J. [58] ("Pl.'s Resp. to Def.'s SOF") ¶¶ 8, 10.)   Significantly, the precise terms of this new program were not conveyed at the Market Show; brochures and other materials distributed at the meeting present few specifics about the nature of the conditions imposed on members in return for the credit.  (Pl.'s Resp. to Def.'s SOF ¶¶ 8, 10; Ex. 1 to Def.'s Reply Mem. in Supp. of Mot. for Summ. J. ("Def.'s Reply") [59-1]; Ex. 2 to Def.'s Reply [59-2]; Ex. 3 to Def.'s Reply [59-3].)

Erwin discussed the new RGA program with Dayton Herbranson and Tarinna Hannigan, two True Value employees who had been assigned to help Erwin develop his store.  (Pl.'s SOF ¶ 18.)  Erwin claims that Herbranson and Hannigan urged him to switch from the OSO program in the First RGA to the one advertised at the Spring Market.  (Pl.'s SOF ¶ 19; Def.'s SOF ¶ 10.) Herbranson and Hannigan themselves did not know all the terms and conditions of the new program (Herbranson Dep. 65:22–66:23, 107:19–22; Hannigan Dep. 59:10–60:19), though Hannigan recalled hearing Herbranson tell Erwin that one provision of the new agreement could be "a deeper clawback" of the OSO.  (Hannigan Dep. 60:11–61:11.)  The parties do agree that one condition Defendants would be required to meet was bringing the store into compliance with certain store appearance ("décor") standards.  (Def.'s SOF ¶ 11.)  Herbranson presented the décor requirements to Erwin in e-mail messages dated February 23 and 24, 2012, assuring Erwin that the information in the e-mail "pretty much outlines the Retail Growth Incentive and DTV décor element requirements[.]"  (Group Ex. 1 to Def.'s SOF [46-1].)

On March 6, 2012, Erwin signed the Member Agreement and the Guaranty.  That same day, Erwin received a "New Store Data" document, which set forth a number of financial

projections and other information about the 4950 store. (Def.'s SOF ¶ 12; Ex. B to Resp. Aff. of Ronald C. Erwin to Pl.'s Mot. for Summ. J. ("Erwin Resp. Aff.") [55–2]). Various terms were listed in that document: an "Opening Stock Order Discount," a cryptic reference to "Free $36 per Sq Ft," a merchandising credit of $29,910, and a $400,000 equity loan. (Pl.'s Resp. to Def.'s SOF ¶ 12; Ex. B to Erwin Resp. Aff. [55–2].) With Hannigan's active assistance, Erwin placed orders for inventory, allegedly with the understanding the goods would be "free." (Pl.'s Resp. to Def.'s SOF ¶ 17; Pl.'s SOF ¶ 19.) When Erwin later received member statements from True Value listing amounts owed for the goods, he claims he was assured (he does not say by whom, or when), that he would receive a credit in due course. (Def.'s SOF ¶ 20; Def.'s Stmt. of Add'l Facts ¶ 11.)

In June 2012, True Value sent a new RGA to Erwin. (Ex. J to Pl.'s SOF [42-1] ("Second RGA").) True Value claims that the Second RGA memorialized the terms of the new RGA program, which had not been determined at the Spring Market. (Pl.'s SOF ¶ 20; Pl.'s Statement of Additional Facts [58] ("Pl.'s Stmt. of Add'l Facts") ¶ 4.) The Second RGA requires True Value to provide:

(a)   a $400,000 loan,
(b)   an "opening stock order (OSO) inventory credit of $36 per square foot[,]"
(c)   "ninety (90) days dating on fixtures, lighting, exterior signage, and décor,"
(d)   "performance credit of $1.50 per square foot of True Value retail square footage, not to exceed $24,000" and
(e)   the services of a project manager, at a cost not to exceed $15,000.

(Second RGA ¶ 1.) Critically for this litigation, the Second RGA also contained a provision requiring that the Second RGA remain in effect and that 4950 remain a member of True Value for a seven-year term. (Second RGA ¶¶ 2, 6.) If 4950 were to terminate the agreement early, Paragraph 6 of the Second RGA provided that 4950 would be responsible for "the full repayment of the actual value it received for the OSO discount, the Performance Credit, and the project manager[,]" as well as repayment of the loan. (Second RGA ¶ 6.)

Until late May or early June, neither Herbranson nor Hannigan themselves were aware that the Second RGA would contain the seven-year term or the repayment provision. (Pl.'s Resp. to Def.'s SOF ¶¶ 22, 23.) All of the goods 4950 had ordered for its OSO were delivered by June or July 2012 (Pl.'s Resp. to Def.'s SOF ¶ 2), and the 4950 store opened in July 2012. (Dep. of Ronald C. Erwin, Ex. W to Pl.'s Stmt. of Add'l Facts ("Erwin Dep.") [58-1] 89:7–13.) Erwin did not execute the Second RGA on 4950's behalf until September 25, 2012, after the store opened. (Pl.'s SOF ¶ 22.) The store did not do well, however, and in November 2014, 4950 terminated its membership in True Value. (Pl.'s SOF ¶ 25.) True Value then issued an invoice in the amount of $413,219.10 for the OSO credit, and $24,000 for the performance credit. (Pl.'s SOF ¶ 25.) Defendants have repaid the $400,000 loan, but not the invoices. (Pl.'s SOF ¶ 25; Def.'s Resp. to Pl.'s SOF ¶ 25.)

In this lawsuit, True Value seeks damages for breach of contract in the amount of $458,136.64, plus costs, interest, and attorneys' fees, as well as an account of the final balance True Value claims it is owed. (Pl.'s SOF ¶ 26; *see* Compl. [2-1] ¶¶ 16–21.) In response, Defendants assert that the repayment terms are not enforceable. Erwin was not told he would be required to sign any other agreements in order to switch from the First RGA to this alternative RGA program, Defendants contend, nor did True Value advise Erwin there would be any new terms or repayment requirements. (Def.'s Stmt. of Add'l Facts ¶¶ 7, 8.) Instead, as Defendants see things, the 4950 store entered into a new oral agreement with True Value as early as March 2012, one in which the store received free merchandise in return for a commitment to adhere to the True Value décor requirements. (Def.'s Am. Rule 56(b) Resp. to True Value's Statement of Add'l Facts [67] ¶ 6.) There was no additional consideration for the Second RGA, Defendants contend, and the additional terms of the Second RGA are not enforceable. (*Id.*) Both sides seek summary judgment on this issue.

<u>**DISCUSSION**</u>

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *J.S. Sweet Co. v. Sika Chem. Corp.*, 400 F.3d 1028, 1032 (7th Cir. 2005). Where both sides seek summary judgment, the court evaluates each motion by viewing all evidence and drawing all reasonable inferences in favor of the party opposing the motion. *Employers Mut. Cas. Co. v. Skoutaris*, 453 F.3d 915, 923 (7th Cir. 2006) (citing *Huntzinger v. Hastings Mut. Ins. Co.*, 143 F.3d 302, 307 (7th Cir. 1998).)

**I.    True Value's Breach of Contract Claim**

Defendants contend the Second RGA is invalid overall and that the repayment provision True Value seeks to enforce is an unlawful penalty. True Value seeks summary judgment on certain of Defendants' affirmative defenses. The court addresses their arguments below.

**A.    Lack of Consideration**

**1.    The Pre-Existing Duty Rule**

Defendants contend that the Second RGA is unenforceable for lack of consideration. Specifically, they assert that the additional conditions imposed on 4950 in the Second RGA are not valid because True Value gave nothing in return for them; True Value was already bound by the parties' earlier dealings to provide 4950 with the inventory credit. "[I]f the alleged consideration for a promise has been conferred prior to the promise upon which alleged agreement is based, there is no valid contract." *Johnson v. Johnson*, 244 Ill. App. 3d 518, 528, 614 N.E.2d 348, 355 (1st Dist. 1993). "The preexisting duty rule provides that where a party does what it is already legally obligated to do, there is no consideration because there has been no detriment." *Johnson v. Maki & Assocs., Inc.*, 289 Ill. App. 3d 1023, 1028, 682 N.E.2d 1196, 1199 (2d Dist. 1997). True Value had a preexisting duty to issue a credit for the inventory that 4950 had ordered, Defendants contend, because True Value had already delivered those goods

6

at the time the Second RGA was executed, or at least had already promised to give a credit because it had promised the goods would be "free."

True Value responds by emphasizing the integration clause in the Second RGA which, True Value urges, "explicitly manifest[ed] the parties' intention to protect themselves against misinterpretations which might arise from extrinsic evidence." *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 464, 706 N.E.2d 882, 885 (1999). "[A] complete, valid, written contract merges and supersedes all prior and contemporaneous negotiations and agreements dealing with the same subject matter." *Dolezal v. Plastic & Reconstructive Surgery, S.C.*, 266 Ill. App. 3d 1070, 1081, 640 N.E.2d 1359, 1366 (1st Dist. 1994). The court is less certain that the integration clause has the effect for which True Value argues, however. That clause is valid only if the agreement itself is supported by consideration, and under Illinois law, the court is free to consider extrinsic evidence on that question. "Parol evidence of prior or contemporaneous agreements is admissible . . . where a party alleges that there was . . . a lack of consideration[.]" *Land of Lincoln Sav. & Loan v. Michigan Ave. Nat. Bank of Chicago*, 103 Ill. App. 3d 1095, 1101, 432 N.E.2d 378, 383 (3d Dist. 1982). The court considers the extrinsic evidence below.

### 2.     Alleged Modification of the First RGA

The parties agree that they entered into the First RGA in January 2012 and that the First RGA provided for a 25% discount against 4950's purchase of inventory for the OSO. The Second RGA was arguably more generous: it provided for a 100% discount, but only if 4950 stayed in business as a True Value store for seven years. As described above, Defendants contend they are not bound by this condition because by the time Erwin signed the Second RGA, he was operating under a modification of the First RGA, entered into on March 6, 2012—a modification that required no more than for the 4950 store to comply with True Value's décor requirements. (*See* Def.'s Stmt. of Add'l Facts ¶ 7 (Erwin believed the First RGA was "modified on March 6, 2012"); (Def.'s Mem. in Resp. to True Value's Mot. for Summ. J. [54] ("Def.'s Resp. Mem.") 5 (describing the "modification" as "confirmed by the New Store Data document dated

7

March 6, 2012"); Def.'s Resp. Mem. 7 (arguing that the First RGA was "extinguished/replaced by the Free Goods program in March 2012").)

Defendants urge that there is evidence of an offer, acceptance, and consideration for this earlier modification. *See Dohrmann v. Swaney*, 2014 IL App (1st) 131524, ¶ 23, 14 N.E.3d 605, 611. "The test for an offer is whether it induces a reasonable belief in the recipient that he can, by accepting, bind the sender." *Architectural Metal Sys., Inc. v. Consol. Sys., Inc.*, 58 F.3d 1227, 1229 (7th Cir. 1995) (citing *McCarty v. Verson Allsteel Press Co.*, 89 Ill. App. 3d 498, 508, 411 N.E.2d 936, 943 (1st Dist. 1980)). "A lack of essential detail would negate such a belief, since the sender could not reasonably be expected to empower the recipient to bind him to a contract of unknown terms." *Id.* "No contract exists under Illinois law, and, indeed, under principles of general law, if the agreement lacks definite and certain terms; nor is a contract formed by an offer that itself lacks definite and certain material terms and does not require such terms to be supplied by an acceptance." *Ass'n Ben. Servs. v. Caremark RX, Inc.*, 493 F.3d 841, 850 (7th Cir. 2007). Although Defendants are less than specific about the offer, the court notes several circumstances that might support a finding that one was made: (1) the New Store Data document provided to Erwin on March 6, (2) promotion materials for the new RGA program, coupled with Hannigan's and/or Herbranson's recommendations that 4950 participate in the new RGA program, (3) Herbranson's February 23 and 24 emails to Erwin, or (4) Hannigan's ordering of the OSO goods on the 4950 store's behalf.

Whether any of these (or a combination thereof) could support a reasonable belief that True Value agreed to provide free goods in exchange for nothing more than compliance with the décor requirements depends on the communications between Erwin and True Value employees in early 2012. The parties' accounts of these conversations are conflicting. The promotion materials for the RGA program that were distributed at the Spring Market show characterize the OSO goods as "free" but do refer to the fact that terms and conditions would be attached. Erwin inquired about the other terms and conditions, and Herbranson and Hannigan confirm that they

told Erwin that there would be additional conditions (Herbranson Decl. ¶ 12; Herbranson Dep. 69:21–70:7; Hannigan Dep. 59:10–60:20), including a "clawback" provision. (Hannigan Dep. 60:11–61:11.) But Herbranson and Hannigan acknowledged that they did not know about the seven-year term requirement until they saw the Second RGA. (Hannigan Decl. ¶ 14; Herbranson Decl. ¶ 12; Herbranson Dep. 107:19–22.)

Erwin insists he was not told he would be required to sign any other agreements. (Erwin Resp. Aff. [55] 2.) He also claims that he heard nothing about the repayment provision or the seven-year term. (Erwin Resp. Aff. 3.) When Erwin later received a Member statement, and asked about charges listed there, he claims he was assured the 4950 store would receive a credit "in due course." (Erwin Resp. Aff. 4.) He claims, further, that he understood that the new décor requirements were the only obligations he took on by agreeing to participate in the new RGA program. (Erwin Resp. Aff. 2–3.) And he contends he would not have incurred the expense and effort to adopt the prescribed décor, had he not believed he had reached an agreement to do so. (*See* Erwin Resp. Aff. 2–3.) The parties' dispute about what True Value employees told Erwin about the new RGA program precludes summary judgment in favor of True Value on the question of whether the Second RGA was supported by new consideration.

Those disputes also defeat Defendants' own request for summary judgment that the Second RGA is unenforceable. In support of that request, Defendants note that True Value's own employees have testified that the Second RGA was not signed until after all the benefits were conferred. (Def.'s SOF ¶¶ 24, 34.) Thus, Herbranson testified that the goods had been ordered and stocked at the time the Second RGA was signed (Herbranson Dep. 99:4–100:18), and that the Second RGA was sent "after the fact" (Def.'s SOF ¶ 24), and Steven Brookhart, another True Value employee, confirmed that the store was "completed" when the Second RGA was signed. (Def.'s SOF ¶ 34.) The fact that True Value delivered goods before execution of the Second RGA does not by itself establish that there was a binding contract between the parties at that point, however. Nor does the court agree with Defendants that, by arguing that

the First RGA remained in effect until the Second RGA was executed, True Value has effectively "conceded" that the First RGA was modified. (Def.'s Reply [59] 7.) Brookhart testified that 4950 and True Value "were still technically operating under the [First RGA]" until they signed the Second RGA. (Dep. of Steven Brookhart, Ex. 4 to Def.'s Mot. for Summ. J. [49] 72:10–73:2.) That testimony may mean, as Defendants believe, that a *modification* of the First RGA was in place. But this testimony is equally consistent with the assertion that the First RGA was in place, *unmodified*, until the Second RGA was executed. Finally, Defendants note evidence that True Value typically issues the OSO credit two to three weeks after the goods are delivered. (Def.'s SOF ¶ 25.) That standard practice does not constitute evidence that True Value had entered into an agreement to issue a credit to the 4950 store, however.

A jury may find that the First RGA was modified, that Defendants were entitled to free OSO goods under the modification, and that the Second RGA is not enforceable. The jury might also reach the opposite conclusion. Neither party is entitled to summary judgment on the issue of whether the Second RGA is invalid for lack of consideration.

### B.    Estoppel

Relatedly, Defendants argue that True Value is estopped from enforcing the Second RGA (or from refusing to comply with the terms of the purported modification). (Revised Am. Answer to Compl. and Affirmative Defenses and Countercl. [34] ("Answer") at 14.) Equitable estoppel bars a person from asserting rights against another party who detrimentally relied on the person's conduct. *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313, 751 N.E.2d 1150, 1157 (2001). Representations need not be fraudulent to support equitable estoppel, so long as they are unjust. *Bd. of Library Trs. of Vill. of Midlothian v. Bd. of Library Trs. of Posen Pub. Library Dist.*, 2015 IL App (1st) 130672, ¶ 35, 34 N.E.3d 602, 612, *appeal denied*, 39 N.E.3d 1000 (Ill. 2015).

This defense is effectively identical to the lack of consideration defense; Defendants' claim that True Value is estopped from enforcing the Second RGA is predicated on a valid oral

modification of the contract—which, as explained above, is an issue for trial. In *Werner v. Timm*, 4 Ill. App. 3d 573, 575, 281 N.E.2d 395, 397 (3d Dist. 1972), the plaintiffs detrimentally relied on an oral contract modification, and the defendants later disavowed the modification's existence by raising a Statute of Frauds defense. *Id.*, 281 N.E.2d at 396–97. The court held that the defendants were estopped from disclaiming the modification because the plaintiffs had detrimentally relied on it. *Id.* Here, if the First RGA was modified (again, an issue for a jury), then True Value may be estopped from enforcing the Second RGA if Defendants detrimentally relied on that modification. Defendants claim that they would not have ordered certain goods if they had known of the repayment provision, or that they had any obligation beyond the décor requirements.

True Value again invokes the Second RGA's integration clause, but as with the lack of consideration defense, this integration clause is irrelevant if the Second RGA is unenforceable. If an oral modification existed and if Defendants detrimentally relied on it, then True Value may be estopped from enforcing the Second RGA, along with its integration clause. Summary judgment is denied on this argument, as well.

### C.    Duress

Defendants also raise the defense of duress—under Illinois law, "a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of the exercise of his free will." *Rissman v. Rissman*, 213 F.3d 381, 386 (7th Cir. 2000) (quoting *Curran v. Kwon*, 153 F.3d 481, 489 (7th Cir. 1998)). "The essential question is whether a 'threat has left the individual bereft of the quality of mind essential to the making of a contract.'" *Rissman*, 213 F.3d at 386 (quoting *Kaplan v. Kaplan*, 25 Ill. 2d 181, 186, 182 N.E.2d 706, 709 (1962)). "Duress does not exist merely where consent to an agreement is secured because of hard bargaining positions or the pressure of financial circumstances." *Higgins v. Brunswick Corp.*, 76 Ill. App. 3d 273, 277, 395 N.E.2d 81, 85 (1st Dist. 1979). "In cases where

agreements have been invalidated because of duress, the conduct of the party obtaining the advantage is tainted with some degree of fraud or wrongdoing." *Id.*

Whether the circumstances in this case support a claim of duress is a close question. Defendants have asserted that Erwin signed the Second RGA because "4950 was financially unable to repay True Value for the amount of the free goods" (Erwin Resp. Aff. 5), but the pressure of financial circumstances alone is not duress. Defendants also argue, however, that 4950 signed the Second RGA because of True Value's wrongdoing; namely, True Value's concealment of all the terms of the Second RGA until after 4950 had ordered a significant quantity of OSO goods. For example, Erwin claims that Herbranson or Hannigan told Erwin that 4950 would be given a credit in due course before Erwin knew of the Second RGA. (Erwin Resp. Aff. 4.) True Value never warned Erwin, he claims, that he would need to execute a Second RGA or maintain his store for seven years in order to earn the discount. (Erwin Resp. Aff. 2–3.) Instead, Defendants assert, True Value revealed the décor requirements but otherwise concealed the terms of the agreement until Defendants ordered merchandise worth more than $400,000.

These circumstances, if true, appear to go beyond hard bargaining positions or the pressure of financial circumstances. "Illinois . . . applies a functional approach under which opportunistic exploitation of options that contracts were designed to foreclose equals duress. The party that performs first incurs sunk costs, which the other may hold hostage by demanding greater compensation in exchange for its own performance." *Rissman*, 213 F.3d at 386–87. If True Value waited to send the Second RGA until after 4950 had spent money on the store's décor, 4950 might have been in a position where it could not afford both the décor requirements *and* to pay for its OSO.

True Value correctly observes that 4950 "was operating under the [First] RGA" when it placed its first OSO order. (Reply Mem. in Supp. of True Value's Mot. for Summ. J. [60] ("Pl.'s Reply") 13). Erwin did place the initial OSO order before knowing anything about the new

program, when the terms of the First RGA were in place. But Defendants do not claim that they were coerced into placing the initial OSO order. Instead, Defendants claim that they were induced into agreeing to participate in the new program, choosing to order more inventory and spending money to change the store's décor. (*See* Erwin Resp. Aff. 2–3.) As True Value points out, "4950 continued to purchase additional goods after signing the Second RGA" (Pl.'s Reply 13–14), but that fact by itself does not defeat the claim of duress; having signed the Second RGA, Defendants were motivated to make the business succeed. Summary judgment is denied with respect to Defendants' duress defense.

Because there is a material dispute whether the Second RGA is invalid for lack of consideration because of a prior modification of the First RGA, or for duress, neither side is entitled to summary judgment on the claim that Defendants breached the Member Agreement. But, as explained below, Defendants' remaining theories are insufficient as a matter of law.

### D. Liquidated Damages Clause/Unenforceable Penalty

As described above, Paragraph 6 of the Second RGA requires 4950 to repay "the actual value [4950] received for the OSO discount," as well as other amounts, should 4950 cease to be a True Value member within seven years of signing the Second RGA. Citing factors identified in *GK Dev., Inc. v. Iowa Malls Fin. Corp.*, 2013 IL App (1st) 112802, ¶ 49, 3 N.E.3d 804, 816, Defendants contend that, if the Second RGA is enforceable at all, Paragraph 6 is not, because it is an unlawfully excessive liquidated damages provision.

A liquidated damages provision "determines in advance" an "agreed-on sum" of damages. *Liquidated-Damages Clause*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see Jameson Realty Grp. v. Kostiner*, 351 Ill. App. 3d 416, 423, 813 N.E.2d 1124, 1130 (1st Dist. 2004) (defining a penalty as "*fixing* unreasonably large liquidated damages") (emphasis added) (quoting *Penske Truck Leasing Co., L.P. v. Chemetco, Inc.*, 311 Ill.App.3d 447, 454, 725 N.E.2d 13, 19 (2000)); *see also GK Dev., Inc.*, 2013 IL App (1st) 112802, ¶ 47, 3 N.E.3d at 816 (same); *First Nat. Bank & Tr. Co. of Barrington v. Maas*, 26 Ill. App. 3d 733, 738, 327 N.E.2d 205, 209

13

(1st Dist. 1975) ("[D]amages are liquidated where they can be determined from the contract itself . . . but where it is necessary to introduce evidence . . . the damages are unliquidated.").

The court agrees with True Value that Paragraph 6 does not constitute a liquidated damages provision because it does not set forth a fixed or predetermined recovery. As True Value points out, Paragraph 6 "merely revokes a credit" and requires Defendants "to pay for the value of the products it received." (True Value's Mem. in Supp. of Mot. for Partial Summ. J. [41] ("Pl.'s Mem.") 10.) The amount of damages contemplated by that paragraph depends on the amount of OSO inventory that 4950 ordered but did not pay for, and therefore depends on the actions of the parties, just like any other damages award. Had Defendants refused to pay for any order, the fact that the amount owed could be determined in advance would not convert an obligation to pay that amount into a liquidated damages provision. Defendants are correct that "[t]he fact that the parties failed to use the term 'liquidated damages' in the clause is not conclusive." *Ace Hardware Corp. v. Marn, Inc.*, No. 06-CV-5335, 2008 WL 4286975, at *11 (N.D. Ill. Sept. 16, 2008). But *Ace Hardware* does not otherwise support Defendants' position. In that case, the amount of damages was fixed at $10,000 per month while the breach was ongoing, "thereby setting the amount of damages *ex ante*[.]" *Id.* (italics in original). In this case, in contrast, the measure of damages is "fixed" only in the sense that the amount of goods Defendants ordered, but did not pay for, is undisputed; it was not fixed *ex ante*.

In their briefs, Defendants argue that Paragraph 6 "does not apply" (meaning, presumably, that True Value is not entitled to enforce it) for several reasons, but none are persuasive. First, Defendants point out that True Value's conception of "actual value" does not describe what True Value itself paid for the goods, because it received some goods at a discount from its own vendors. Defendants do not explain how the cost to True Value of the goods at issue is relevant, however. Regardless how much True Value itself paid for the goods it provided to 4950, they presumably are worth what a willing buyer (another True Value store ordering inventory, for example) would have paid for them.

Second, Defendants claim they understood the goods True Value provided to 4950 were "free," rather than merely discounted, so Paragraph 6's reference to the "OSO discount" is inapplicable.  (Def.'s Resp. Mem. 8.)  Here, Defendants interpret the term "discount" too narrowly.  A discount is "[a] reduction from the full amount or value of something[,]" *Discount*, BLACK'S LAW DICTIONARY (10th ed. 2014); thus, True Value could refer to a program that effectively reduced the price of goods to zero as a "discount."  That interpretation fits here, as Paragraph 1 of the Second RGA provides for a credit for the OSO goods and the performance credit, and Paragraph 6 references a "discount."  Defendants' suggestion that the discount referenced in Paragraph 6 is something other than the credit described in Paragraph 1 makes little sense.  *See Rubin v. Laser*, 301 Ill. App. 3d 60, 68, 703 N.E.2d 453, 459 (1st Dist. 1998) ("Courts construe contracts so as to avoid absurd results.").

Defendants' third and fourth arguments rephrase the first two.  They urge that because 4950 effectively received no discount at all, and because the "actual value" of the inventory is "meaningless," Paragraph 6 is ambiguous and must be construed against True Value.  (Def.'s Resp. Mem. 8–9).  For the reasons explained earlier, however, the Second RGA did by its terms provide for a discount, and the fact that the "actual value" of the goods is not *quantified* does not make the term "meaningless."

Finally, Defendants argue that True Value's conception of "actual value" is simply a reflection of True Value's own accounting method.  This fact, if true, does not render Paragraph 6 unenforceable.  The amounts at issue were reflected on 4950's member statement as purchases.  (Def.'s SOF ¶ 20.)  The damages True Value seeks are thus not arbitrary; they reflect what True Value would have charged for the goods absent any discount—effectively a restitution measure of damages.[2]

---

[2]     Case law appears to support this conclusion.  The shareholder agreement at issue in *ICD Publications, Inc. v. Gittlitz*, 2014 IL App (1st) 133277, ¶¶ 76–77, 24 N.E.3d 898, 919–20, provided for a stock repurchase in the event that the shareholder ceased to be an employee of the corporation.  That repurchase provision was valid and enforceable when the

A restitution award makes sense in this context. True Value's expectation damages—the inventory that True Value could have expected 4950 to purchased had it remained a member for five more years—would be difficult, if not impossible, to prove. (*See* Def.'s Mem. in Supp. of Mot. for Summ. J. [47] ("Def.'s Mem.") 10; True Value's Mem. of L. in Opp. to Def.'s Mot. for Summ. J. [57] 12.) The damage to True Value's brand and reputation from 4950's early termination is similarly difficult to quantify. (Def.'s Mem. 10; Herbranson Dep. 24:16–20.) "[Restitution] is a legal remedy when sought in a case at law (for example, a suit for breach of contract)[.]" *Mondry v. Am. Family Mut. Ins. Co.*, 557 F.3d 781, 806 (7th Cir. 2009) (quoting *Clair v. Harris Tr. & Sav. Bank*, 190 F.3d 495, 498 (7th Cir. 1999)); *see* Restatement (Third) of Restitution and Unjust Enrichment § 38 (Am. Law Inst. 2011) ("As an alternative to damages based on the expectation interest . . . a plaintiff who is entitled to a remedy for material breach or repudiation may recover damages measured by the cost or value of the plaintiff's performance."); 24 *Williston on Contracts* § 64:2 (4th ed.) (defining 'restitution interest' as one party's "'interest in having restored to him any benefit that he has conferred on the other party.'") (quoting Restatement (Second) of Contracts § 344 (Am. Law Inst. 1981)).

The court concludes that if the Second RGA is enforceable, Paragraph 6 is not an unlawful penalty. True Value is entitled to summary judgment on this issue.

### E. Fraud in the Inducement

Finally, Defendants allege that True Value fraudulently induced 4950 into participating in the new RGA program and ordering the OSO goods without telling 4950 about the seven-year term. To establish fraud in the inducement, a party must allege "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent to

---

employee-defendant was involuntarily terminated by plaintiff and then received book value for the repurchased shares. *Id.* at ¶ 22, 24 N.E.3d at 907. In *Fleet Business Credit, LLC v. Enterasys Networks, Inc.*, 352 Ill. App. 3d 456, 460, 472, 816 N.E.2d 619, 622–23, 632 (1st Dist. 2004), the court concluded that a requirement that the defendant assume certain lease obligations in the event of a breach was not a liquidated damages provision because the provision permitted the plaintiff to "recover only an amount that would put it in the same position it was in prior to agreeing to finance the [leases]."

induce plaintiff's reliance on the statement; (4) plaintiff's reasonable reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Merrilees v. Merrilees*, 2013 IL App (1st) 121897, ¶ 30, 998 N.E.2d 147, 158.

Both sides overstate the strength of their positions on this defense. As Defendants see things, for example, True Value has effectively admitted engaging in fraud by concealing terms that would be imposed as part of the Second RGA. (Def.'s Reply 14.) This is an overstatement; True Value has never agreed that member stores were required to "execute a contract with undisclosed terms." (*See* Def.'s Reply 14.) Instead, True Value insists its employees repeatedly told Erwin that (1) there were additional terms in the new retail growth program and (2) they would tell Erwin those terms when they became available. For its part, True Value emphasizes the integration clause in the Second RGA and argues that such a clause bars consideration of extrinsic evidence, including evidence of any representations about the new RGA program made before the Second RGA was signed. (Pl.'s Mem. 13.) This, too, appears to be an overstatement; "parol evidence on the allegation of fraud in the inducement . . . is admissible to prove the fraud[.]" *Gen. Elec. Credit Auto Lease, Inc. v. Jankuski*, 177 Ill. App. 3d 380, 386, 532 N.E.2d 361, 365 (1st Dist. 1988); *see also Kolson v. Vembu*, 869 F. Supp. 1315, 1321 (N.D. Ill. 1994), *supplemented* (Nov. 30, 1994) ("There are however exceptions to that general bar of parol evidence . . . . including fraud in the inducement of the contract."). "[A]ll an integration clause does is limit the evidence available to the parties should a dispute arise over the meaning of the contract. It has nothing to do with whether the contract was induced . . . by fraud." *Vigortone AG Prod., Inc. v. PM AG Prod., Inc.*, 316 F.3d 641, 644 (7th Cir. 2002).

The court concludes that statements made to Erwin before he signed the Second RGA are admissible, but not that he relied on those statements when he signed it. Defendants themselves have not argued that they were induced by fraud to sign the second RGA; instead, they allege that True Value induced Defendant 4950 to order the OSO goods and assured Erwin that they would be "free." Whatever Erwin believed about the cost of the goods when he

ordered them, however, he was or should have become aware of the actual terms of his deal when it appeared in writing. At that time, he was on notice that the agreement imposed a seven-year term and a repayment provision. Erwin did not complain about signing the Second RGA when he received it. (Def.'s Resp. to Pl.'s SOF ¶ 22). If he signed the agreement involuntarily, or because he felt he had no choice, that could support a claim of duress, not fraudulent inducement. True Value is entitled to summary judgment on this issue.

## II.     True Value's Breach of Guaranty Claim

True Value also seeks to enforce the personal guaranty that Erwin signed. Erwin argues that the Guaranty is void because any obligation the 4950 store owes arises only from the Second RGA, which is not enforceable, and because the Second RGA materially increased his risk. The court addresses these arguments separately.

### A.     The Guaranty's Application to the Second RGA

Under the Guaranty, Erwin is personally liable for "any and all amounts owed for goods, wares, inventory, merchandise and services, amounts due under any installment notes, and any other past, present or future indebtedness due from [the 4950 store]." (Guaranty at 1.) Erwin claims that the Guaranty "applied solely to the Member Agreement," but not to the Second RGA. (Answer at 15.) In order to hold him liable under the Second RGA, Erwin contends, True Value required a separate guaranty, but never requested one. In support, Erwin cites to the provision of the Second RGA that requires him to execute additional documents "requested by True Value . . . in relation to [the Second RGA]," specifically including guaranties. (Second RGA ¶ 2(i).) The Second RGA refers to additional guaranties that Erwin might be required to sign; that reference does not render the Guaranty he did sign unenforceable. Erwin signed that Guaranty before he executed the Second RGA, but it specifically covers future obligations and holds Erwin responsible for all "amounts owed" and "any indebtedness" incurred by the 4950 store.

In support of his argument that a second, separate guaranty is required before Erwin can be held liable, Erwin emphasizes testimony of True Value employees on the issue. For example, Herbranson thought the Guaranty "related to" the Member Agreement and testified that "[t]he retail growth agreement and the membership agreements are two different sets of documents." (Herbranson Dep. 59:19–60:2, 84:24–85:2.) Stuart McInnis, another True Value manager, testified that "Mr. Erwin signed a guaranty for all of the debts that are due by [4950]," and that Erwin did not sign a guaranty specifically for the Second RGA. (Dep. of Stuart McInnis, Ex. 5 to Def.'s Mot. for Summ. J. [49] 28:1–13.) None of this testimony establishes that the Guaranty does not apply to the repayment obligation.[3] The Second RGA and the Member Agreement are two different documents. The Guaranty "relates to" the Member Agreement in the sense that it makes Erwin responsible for 4950's debts to True Value. And the Second RGA creates a debt to True Value. Erwin presents no evidence that the Guaranty's "relation to" the Member Agreement somehow excludes debts arising under the Second RGA.

In any event, the opinion of True Value employees is not legally significant. The court interprets contract language, and in this case finds that language unambiguous: the Guaranty renders Erwin liable for *all* of the 4950 store's indebtedness. "In attempting to determine the terms of a guaranty, the general rules of contract construction apply." *Ford Motor Credit Co. v. Lee*, No. 82 C 1706, 1984 WL 2761, at *2 (N.D. Ill. Jan. 23, 1984) (citing *Blackhawk Hotel Assoc. v. Kaufman*, 85 Ill. 2d 59, 421 N.E.2d 166, 168 (1981)). "These general rules [include] . . . 'where there is a written contract in evidence, the intentions of the parties must be determined from its language alone, not from what the parties thought.'" *Id.* (quoting *Dee v. Bank of Oakbrook Terrace*, 84 Ill. App. 3d 1022, 1024, 406 N.E.2d 195, 198 (1st Dist. 1980).

---

[3] Defendants, in their brief, purport to quote from Defendants' Statement of Facts ¶ 31: "Personal guarantees are required not only for the retail growth agreement but also for the membership agreement." (Def.'s Mem. 13.) The court did not find that language in Paragraph 31, nor in any of the deposition testimony cited in support of that paragraph.

"Where the language of the contract is clear and unambiguous, extrinsic facts are not to be considered." *Id.* (quoting *Dee*, 84 Ill. App. 3d at 1024–25, 406 N.E.2d at 198).

In construing a guaranty, "the court accords the guarantor the benefit of any doubts that may arise from the language of the contract." *Ringgold Capital IV, LLC v. Finley*, 2013 IL App (1st) 121702, ¶ 16, 993 N.E.2d 541, 546. In *Ringgold,* where the guaranty was limited by its terms to loan documents dated June 27, 2007, the court refused to enforce it because the loan documents were dated August 24. *Id.* at ¶¶ 22, 27–28, 993 N.E.2d at 548, 550. Similarly, in *Ford Motor Credit*, 1984 WL 2761, at *4, the guaranty identified certain circumstances in which it would not be enforced. The list did not include sale of the underlying dealership, and the court found the guaranty ambiguous concerning whether it was enforceable after such a sale. *Id.* at *1, *4. But in this case, the Guaranty language expressly applies to all indebtedness, and does not leave an open question about circumstances in which it will not be enforced. *Ringgold* itself recognizes that "[w]here a guaranty is unequivocal, it must be construed according to the terms and language used[.]" 2013 IL App (1st) 121702, ¶ 27, 993 N.E.2d at 550. That principle controls this case.

### B.     Material Increase in Risk

Finally, Defendants argue that finding the Guaranty enforceable with respect to the repayment provision of the Second RGA would constitute a material change in Erwin's risk. "Under Illinois law, a guarantor is discharged from his obligations with the alteration of 'the underlying contract' unless 'the essentials of the original agreement have not been changed and the performance required of the principal is not materially different from that first contemplated,' or where 'the guarantor has knowledge of and assents, either expressly or by implication, to such change.'" *Lyon Fin. Servs., Inc. v. Bella Medica Laser Ctr., Inc.*, 738 F. Supp. 2d 856, 860 (N.D. Ill. 2010) (quoting *Lawndale Steel Co. v. Appel*, 98 Ill. App. 3d 167, 172, 423 N.E.2d 957, 962 (2d Dist. 1981)).

The *Lyon* court explained that under Illinois law, "'[w]hether a guarantor is exposed to an increase in the risk it originally undertook is a key variable in determining whether there has been a material change in the guaranty agreement.'" 738 F. Supp. 2d at 860 (quoting *Chicago Exhibitors Corp. v. Jeepers! of Illinois, Inc.*, 376 Ill. App. 3d 599, 606, 876 N.E.2d 129, 136 (1st Dist. 2007)) (alteration in original). Yet Illinois law also provides that "if a guarantor consents 'to a change in the contract, he will not be released.'" *Id.* (quoting *Roels v. Drew Indus., Inc.*, 240 Ill. App. 3d 578, 583, 608 N.E.2d 411, 415 (1st Dist. 1992)). In *Lyon,* the court refused to enforce a guaranty where the debtor company and the creditor had re-written the underlying lease agreement, making changes to it, after the guarantor had stopped working for the debtor. *Id.* at 859, 861. Nothing like that happened in this case. Erwin himself, already bound by the terms of the Guaranty, signed the Second RGA and continued as the store's principal. His guaranty of "all" indebtedness clearly contemplates that the indebtedness could increase after the day the Member Agreement was signed. If the Second RGA is valid, the Guaranty is enforceable against Erwin, as well. Neither side is entitled to summary judgment on the breach of guaranty claim.

III.     **True Value's Account Stated Claim**

True Value's claim for "account stated" requires only brief discussion. "An account stated is an agreement between parties who previously engaged in transactions that the account representing those transactions is true and the balance stated is correct, together with a promise for the payment of the balance." *Dreyer Med. Clinic, S.C. v. Corral*, 227 Ill. App. 3d 221, 226, 591 N.E.2d 111, 114 (2d Dist. 1992). "'An account stated only determines the amount of the debt where a liability exists, and cannot be made to create a liability *per se* where none before existed.'" *Id.* (quoting *Sexton v. Brach*, 124 Ill. App. 3d 202, 205, 464 N.E.2d 284, 286 (3d Dist. 1984)). "In other words, an account stated is merely a form of proving damages for the breach of a promise to pay on a contract." *Id.* Because the existence of an account stated

turns on the enforceability of the Second RGA, the court denies Defendants' motion for summary judgment on this claim.

## IV. Defendants' Counterclaim

Finally, Defendants have counterclaimed, alleging True Value's breach of the Member Agreement for withholding 4950's dividend. (Answer at 16; *see* Ex. F to Pl.'s SOF [42-1] ("Member Agreement")) ¶ 4.) "Under general contract principles, a material breach of a contract provision by one party may be grounds for releasing the other party from his contractual obligations." *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 70, 866 N.E.2d 85, 95 (2006). If 4950 breached the Member Agreement, then True Value would be entitled to retain the dividend to offset its damages. Defendants deny this, and argue that True Value must repay the dividend regardless of its liability on True Value's breach of contract claim. (Def.'s Resp. Mem. 15 n.13.) In their counterclaim, Defendants assert that "True Value's officers and employees have now testified that the foregoing set-off and the balance of the [dividend] will not be paid to 4950" and that True Value intends to apply the dividend to any amounts Defendants owe under the complaint. (Answer at 16.) Yet Defendants do not direct the court to any evidence supporting this claim, nor do they make any arguments why any dividend should not be set-off against 4950's liability, if any, to True Value. Summary judgment is therefore also denied on Defendants' counterclaim.

## CONCLUSION

For the reasons stated above, Defendants' motions for summary judgment [45, 49] are denied; Plaintiff's motion for summary judgment [40] is granted in part and denied in part. The parties are encouraged to discuss settlement.

ENTER:

Dated: February 1, 2017

_____

REBECCA R. PALLMEYER
United States District Judge